# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 3094**<br><br>**THIS DOCUMENT RELATES TO ALL CASES**<br><br>**JUDGE KAREN SPENCER MARSTON** |
| **MARK WHITE,**<br>        *Plaintiff,*<br><br>**v.**<br><br>**NOVO NORDISK INC. AND NOVO NORDISK A/S,**<br>        *Defendant.* | **COMPLAINT AND JURY DEMAND**<br><br>**CIVIL ACTION NO.:** _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **MARK WHITE** ("Plaintiff"), files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Tennessee as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in <u>Erwin, Tennessee (Unicoi County)</u> (City/State).

X Plaintiff purchased and used Defendant(s)' products in <u>Erwin, Tennessee (Unicoi County)</u> (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): <u>United States District Court for the Eastern District of Tennessee</u>.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff who was severely injured as a result of Plaintiff's use of Ozempic, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes.

2.      Ozempic is also known as semaglutide. Ozempic works by stimulating insulin production and reducing glucose production in the liver helping to lower blood sugar levels.

3.      Ozempic belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

4.      Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[1] However, Defendants have downplayed the severity of the gastrointestinal events caused by their GLP-1RAs including gastric outlet obstruction.

5.      Gastric outlet obstruction is a clinical syndrome characterized by a blockage that hinders the normal emptying of the stomach. Food passes quickly from the stomach during normal gastric emptying. Muscles surrounding the stomach contract to move solid food through the pyloric sphincter and out of the stomach. However, with gastric outlet obstruction, the pylorus, the outlet of the stomach, is blocked which prevents food from passing into the small intestine. Common symptoms of gastric outlet obstruction are abdominal pain, postprandial vomiting, early satiety, and weight loss.

## PARTY PLAINTIFF

6.      Plaintiff is a citizen of the United States and is a resident of the State of Tennessee.

7.      Plaintiff is 58 years old.

8.      Plaintiff used Ozempic from approximately 2021 to 2023.

---

[1] *See, e.g.*, CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell''*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysisweight-loss-side-effects-1234794601 (visited on 9/26/23).

9.      Plaintiff's physician(s) ("prescribing physician(s)") prescribed the Ozempic that was used by Plaintiff.

10.     As a result of using Ozempic, Plaintiff was caused to suffer gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in, for example, severe abdominal pain, nausea, and vomiting and required medical treatment and intervention.

11.     Plaintiff sustained severe and permanent personal injuries, pain, suffering, as well as emotional distress, and incurred medical expenses related to the use of Ozempic.

## PARTY DEFENDANTS

12.     Defendant Novo Nordisk Inc. is a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

13.     Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

14.     Defendants Novo Nordisk Inc. and Novo Nordisk A/S are identified on Ozempic's label.[2]

15.     Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively herein as "Novo Nordisk."

16.     Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic. Alternatively, Novo Nordisk has acquired the entity/entities who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic and is, thus, the successor to such entity/entities.

---

[2] Ozempic prescribing information, available at
https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=adec4fd2-6858-4c99-91d4-531f5f2a2d79 (visited on 9/26/23).

3

## FACTUAL BACKGROUND

**A.    FDA's Approval of Ozempic**

17.    On December 5, 2016, Novo Nordisk announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the announcement, Novo Nordisk represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[3]

18.    On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[4]

19.    On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[5] On January 16, 2020, the FDA approved sNDA 209637/S-003.[6]

---

[3] Novo Nordisk, *Novo Nordisk files for regulatory approval of once-weekly semaglutide in the US and EU for the treatment of type 2 diabetes* (Dec. 5, 2016), available at
https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (visited on 9/26/23).
[4] FDA Approval Letter for NDA 209637 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (visited on 9/26/23).
[5] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes*, Cision PR Newswire (March 20, 2019), available at
https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-bloodsugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (visited on 9/26/23).
[6] FDA Supplement Approval Letter for NDA 209637/A-003 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (visited on 9/26/23).

20.    On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28, 2022, the FDA approved sNDA 209637/S-009.[7]

**B.    Novo Nordisk's Marketing and Promotion of Ozempic**

21.    On December 5, 2017, Novo Nordisk announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[8]

22.    On February 5, 2018, Novo Nordisk announced that it had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[9]

---

[7] FDA Supplement Approval Letter for NDA 209637/S-009 (Ozempic), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (visited on 9/26/23).
[8] *Novo Nordisk Receives FDA Approval of OZEMPIC® (semaglutide) Injection For the Treatment of Adults with Type 2 Diabetes*, Cision PR Newswire (December 05, 2017), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injectionfor-the-treatment-of-adults-with-type-2-diabetes-300567052.html (visited on 9/26/23).
[9] *Novo Nordisk Launches Ozempic® and Fiasp®, Expanding Treatment Options for Adults with Diabetes*, Cision PR Newswire (February 05, 2018), available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatmentoptions-for-adults-with-diabetes-300592808.html (visited on 9/26/23).

23.    Novo Nordisk promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

24.    On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic, to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not indicated for weight loss.[10]

25.    On March 28, 2022, Novo Nordisk announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Novo Nordisk represented Ozempic as having "proven safety" and advertised that "plus it can help many patients lose some weight."[11]

26.    Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[12]

27.    In 2022, Novo Nordisk spent $180.2 million on Ozempic ads, including an estimated $157 million on national television ads for Ozempic, making Ozempic the sixth most advertised drug that year. As a result of its GLP-1RA treatments, including Ozempic, Novo Nordisk forecasts sales growth of 13% to 19% for 2023.[13]

---

[10] *Ozempic TV Spot, 'Oh!'*, iSpot.tv (July 30, 2018), available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (visited on 9/26/23).

[11] *Novo Nordisk receives FDA approval of higher-dose Ozempic® 2 mg providing increased glycemic control for adults with type 2 diabetes*, Cision PR Newswire (March 28, 2022), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mgproviding-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (visited on 10/16/23).

[12] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023), available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (visited on 9/26/23).

[13] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/specialreports/top-10-pharma-drug-brand-ad-spenders-2022 (visited on 9/26/23).

28.    On July 6, 2023, it was reported that Novo Nordisk had spent $11 million in 2022 on food and travel for doctors "as part of its push to promote Ozempic and other weight loss-inducing diabetes drugs."[14] The spending bought more than 457,000 meals for almost 12,000 doctors while also flying doctors to places like London, Paris, Orlando, and Honolulu.[15]

29.    In an article published on July 21, 2023, the President and CEO of the Alliance of Community Health Plans described Novo Nordisk's spending on meals for doctors as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about potential side effects and long-term effectiveness. The author cited research published in the spring of 2023 showing an increased risk of intestinal obstruction as a result of using GLP-1RA drugs.[16]

30.    As a result of Novo Nordisk's advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new

---

[14] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordiskgave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

[15] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordiskgave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

[16] Erin Prater, *Ozempic manufacturer Novo Nordisk spent $11 million last year 'wining and dining' doctors. Experts slam the move as a breach of doctor-patient trust,* Fortune Well (July 21, 2023), available at https://fortune.com/well/2023/07/21/ozempic-novo-nordisk-meals-travel-prescribing-doctors/ (visited on 9/26/23); *see also* Erin Prater, *Weight-loss drugs like Ozempic and Wegovy may put certain people at risk of serious complications, researchers warn*, Fortune Well (March 7, 2023), available at https://fortune.com/well/2023/03/07/ozempic-wegovy-elevated-risk-intestinal-obstruction-later-type-2-diabetesweight-loss-drug/ (visited on 10/18/23).

prescriptions.[17] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[18]

31.    On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[19] and currently has over 1.3 billion views.[20]

32.    On June 15, 2023, NBC News published a report about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023, Novo Nordisk was still running online social-media ads for its semaglutide products, despite claiming in May that it would stop running ads due to a shortage of the drug.[21]

33.    On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[22]

34.    At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

---

[17] Choi A, Vu H, *Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most*, CNN (March 17, 2023), available at https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktoktelehealth/ (visited on 9/26/23).

[18] Gilbert D, *Insurers clamping down on doctors who prescribe Ozempic for weight loss*, The Washington Post (June 12, 2023), available at https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovyinsurance/ (visited on 9/26/23).

[19] Blum D, *What is Ozempic and Why Is It Getting So Much Attention?*, The New York Times (published Nov. 22, 2022, updated July 24, 2023), available at https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weightloss.html (visited on 9/26/23).

[20] https://www.tiktok.com/tag/ozempic (visited on 11/14/23).

[21] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023), available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagramwegovy-semaglutide-rcna88602 (visited on 9/26/23).

[22] Bain P, *Ozempic was 2023's Buzziest Drug*, AdAge (July 10, 2023), available at https://adage.com/article/specialreport-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (visited on 9/26/23).

C.    **The Medical Literature and Clinical Trials Gave Defendants Notice of Gastrointestinal Injury and Gastric Outlet Obstruction Being Causally Associated with GLP-1RAs**

35.    As previously noted, Ozempic (semaglutide) belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

36.    Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[23]

37.    Because the risk of gastrointestinal injury is common to the entire class of GLP-1RA drugs, any published literature regarding the association between gastrointestinal injury and *any* GLP-1RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risks associated with these drugs.

38.    Defendants knew or should have known of this risk of gastrointestinal injury and gastric outlet obstruction from the clinical trials, medical literature, and case reports.

39.    In addition to pancreatic effects, the published medical literature shows that GLP-1 slows gastric emptying. As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated this effect.[24]

40.    A 2016 trial funded by Novo Nordisk measuring semaglutide and cardiovascular outcomes in patients with type 2 diabetes found more gastrointestinal disorders in the semaglutide

---

[23] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (visited on 9/26/23).

[24] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243 (visited on 9/26/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/about-asa/newsroom/newsreleases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-electivesurgery (visited on 9/26/23).

group than in the placebo group, including a severe adverse event report of impaired gastric emptying with semaglutide 0.5 mg together with other serious gastrointestinal adverse events such as abdominal pain (upper and lower), intestinal obstruction, change of bowel habits, vomiting, and diarrhea.[25]

41.    Two subjects in a semaglutide trial pool by Novo Nordisk reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376. The cardiovascular outcomes trials included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

42.    A study published in 2017 evaluated the effect of GLP-1RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[26]

43.    Another study in 2017 reviewed the survey results from 10,987 patients and 851 physicians and found that "GI-related issues were the top two patient-reported reasons for GLP-1RA discontinuation in the past 6 months, with 'Made me feel sick' as the most frequently reported

---

[25] Marso, SP, et al., Semaglutide and Cardiovascular Outcomes in Patients with Type 2 Diabetes, N. Eng. J. Med. 375:1834-1844 (November 2016), available at https://www.nejm.org/doi/10.1056/NEJMoa1607141 (visited on 10/19/23).
[26] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017), available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (visited on 9/26/23).

reason (64.4%), followed by 'Made me throw up' (45.4%)."[27] As explained above, these are symptoms of gastric outlet obstruction.

44.    A 2019 study of the GLP-1RA drug dulaglutide identified adverse events for impaired gastric emptying and diabetic gastroparesis.

45.    In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[28]

46.    In a September 2020 article funded and reviewed by Novo Nordisk, scientists affiliated with Novo Nordisk reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes. More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% (versus 5.7-7.6% with placebo) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study

---

[27] Sikirica M et al., *Reasons for discontinuation of GLP1 receptor agonists: data from a real-world cross-sectional survey of physicians and their patients with type 2 diabetes*, 10 Diabetes Metab. Syndr. Obes., 403-412 (September 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5630073/ (visited on 12/9/24).

[28] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (visited on 9/26/23).

warned that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs." The study further identified as one "key clinical take-home point" that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs."[29]

47.    A July 2021 article funded and reviewed by Novo Nordisk considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use. When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus up to 8% on the placebo group), vomiting in up to 11.5% of patients (versus up to 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus up to 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for gastrointestinal related adverse events, with some trials experiencing 100% discontinuation due to gastrointestinal related adverse events. The mean value of gastrointestinal related adverse events that led to discontinuation averaged 57.75%. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy[.]"[30]

48.    An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]" In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom

---

[29] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37-47, available at https://doi.org/10.1080/00325481.2020.1800286 (visited on 9/26/23).
[30] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (visited on 9/26/23).

onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.[31]

49.    Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[32]

50.    Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[33]

---

[31] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 2324709621105191, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[32] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 2324709621105191, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[33] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 2324709621105191, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).

51.    A June 2022 study reported GLP-1RA Mounjaro (tirzepatide) adverse events of vomiting, nausea, and "severe or serious gastrointestinal events."[34]

52.    An October 2022 study analyzed 5,442 GLP-1RA adverse gastrointestinal events. 32% were serious, including 40 deaths, 53 life-threatening conditions, and 772 hospitalizations. The primary events were nausea and vomiting. There were also adverse events for impaired gastric emptying.[35]

53.    A January 2023 meta-analysis of GLP-1RA (Mounjaro) adverse events reported high rates of nausea and vomiting.[36]

54.    In February 2023, a longitudinal study of GLP-1RA (dulaglutide) reported adverse events for nausea and vomiting, and one adverse event of impaired gastric emptying.[37]

55.    On March 28, 2023, a case study concluded that impaired gastric emptying is "a significant safety concern, especially since it is consistent with the known mechanism of action of the drug."[38]

56.    On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutide and other GLP-1RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of

---

[34] Jastreboff, *Tirzepatide Once Weekly for the Treatment of Obesity*, N Engl J Med, at 214 (June 4, 2022) (https://doi.org/10.1056/nejmoa2206038).
[35] Shu, *Gastrointestinal adverse events associated with semaglutide: A pharmacovigilance study based on FDA adverse event reporting system*, Front. Public Health (Oct. 20, 2022). (https://doi.org/10.3389%2Ffpubh.2022.996179).
[36] Mirsha, *Adverse Events Related to Tirzepatide*, J. of Endocrine Society (Jan. 26, 2023) (https://doi.org/10.1210%2Fjendso%2Fbvad016).
[37] Chin, *Safety and effectiveness of dulaglutide 0.75 mg in Japanese patients with type 2 diabetes in real-world clinical practice: 36 month postmarketing observational study*, J Diabetes Investig (Feb. 2023) (https://doi.org/10.1111%2Fjdi.13932).
[38] Klein, Semaglutide, delayed gastric emptying, and intraoperative pulmonary aspiration: a case report, Can J. Anesth (Mar. 28, 2023) (https://doi.org/10.1007/s12630-023-02440-3).

food into the airways and lungs during general anesthesia and deep sedation." The ASA also

warned that the risk is higher where patients on these medications have experienced nausea and

vomiting.[39]

57.    News sources have identified the potential for serious side effects in users of

Ozempic leading to hospitalization.[40] For example, NBC News reported in January 2023 that some

Ozempic users were discontinuing use because their symptoms were unbearable, and one user said

that five weeks into taking the medication she found herself unable to move off the bathroom floor

because she had "vomited so much that [she] didn't have the energy to get up."[41] CNN reported in

July that one Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take

a leave of absence from her teaching job.[42]

58.    A July 25, 2023, article in Rolling Stone magazine—"*Ozempic Users Report*

*Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*"—highlighted three patients who have

suffered severe gastrointestinal related events, including gastroparesis, as a result of their use of

GLP-1RAs. Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and

---

[39] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/aboutasa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-shouldstop-before-elective-surgery (visited on 9/26/23).

[40] Penny Min, *Ozempic May Cause Potential Hospitalizations*, healthnews (June 26, 2023), available at https://healthnews.com/news/ozempic-may-cause-potential-hospitalizations/ (visited on 9/26/23); Elizabeth Laura Nelson, *These Are the 5 Most Common Ozempic Side Effects, According to Doctors*, Best Life (April 3, 2023), available at https://bestlifeonline.com/ozempic-side-effects-news/ (visited on 9/26/23); Cara Shultz, *Ozempic and Wegovy May Cause Stomach Paralysis in Some Patients*, People (July 26, 2023), available at https://people.com/ozempic-wegovy-weight-loss-stomach-paralysis-7565833 (visited on 9/26/23); CBS News Philadelphia, *Popular weight loss drugs Ozempic and Wegovy may cause stomach paralysis, doctors warn* (July 23, 2023), available at https://www.cbsnews.com/philadelphia/news/weight-loss-drugs-wegovy-ozempic-stomachparalysis/ (visited on 9/26/23).

[41] Bendix A, Lovelace B Jr., *What it's like to take the blockbuster drugs Ozempic and Wegovy, from severe side effects to losing 50 pounds*, NBC News (Jan. 29, 2023), available at https://www.nbcnews.com/health/healthnews/ozempic-wegovy-diabetes-weight-loss-side-effects-rcna66493 (visited on 9/26/23).

[42] Brenda Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugsgastroparesis/index.html (visited on 9/26/23).

being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1 RAs, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1 RAs are known to cause a delay in gastric emptying, … [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis or other severe gastrointestinal issues.[43]

59.    On July 25, 2023, CNN Health reported that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic." Another patient taking Wegovy (semaglutide) suffered ongoing nausea and vomiting, which was not diagnosed, but which needed to be managed with Zofran and prescription probiotics.[44]

60.    On July 26, 2023, a New York hospital published an article to its online health blog section "What You Need to Know About Gastroparesis" entitled "Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines." It was reported that a growing number of gastroparesis cases had been seen in people taking GLP-1RAs. The article noted that the weight-

---

[43] CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weightloss-side-effects-1234794601 (visited on 9/26/23).
[44] Brenca Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN Health (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugsgastroparesis (last visited on 9/26/23).

loss drugs can delay or decrease the contraction of muscles that mix and propel contents in the gastrointestinal tract leading to delayed gastric emptying. One concern raised was that patients and doctors often assume the symptoms of gastroparesis are reflux or other gastrointestinal conditions, meaning it may take a long time for someone to be diagnosed correctly.[45]

61.    In an October 5, 2023, Research Letter published in the Journal of the American Medical Association ("JAMA"), the authors examined gastrointestinal adverse events associated with GLP-1RAs used for weight loss in clinical setting and reported that use of GLP-1RAs compared with use of bupropion-naltrexone was associated with increased risk of pancreatitis, gastroparesis, and bowel obstruction.[46] The study found that patients prescribed GLP-1RAs were at 4.22 times higher risk of intestinal obstruction and at 3.67 times higher risk of gastroparesis.

62.    The medical literature listed above is not a comprehensive list, and several other case reports have indicated that GLP-1RAs can cause gastroparesis and impaired gastric emptying.[47]

63.    Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastrointestinal injury and gastric outlet obstruction, but they ignored the causal association. Defendants' actual and constructive knowledge derived from

---

[45] *Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines*, Montefiore Health Blog article (released July 26, 2023), available at https://www.montefiorenyack.org/health-blog/what-you-need-knowabout-gastroparesis (last visited on 9/26/2023).

[46] Mohit Sodhi, et al., *Risk of Gastrointestinal Adverse Events Associated with Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss*, JAMA (published online October 5, 2023), available at https://jamanetwork.com/journals/jama/fullarticle/2810542 (last visited 10/19/23).

[47] Cure, *Exenatide and Rare Adverse Events*, N. Eng. J. Med. (May 1, 2008) (https://doi.org/10.1056/nejmc0707137); Rai, *Liraglutide-induced Acute Gastroparesis*, Cureus (Dec. 28, 2018) (https://doi.org/10.7759%2Fcureus.3791); Guo, *A Post Hoc Pooled Analysis of Two Randomized Trials*, Diabetes Ther (2020) (https://doi.org/10.1007%2Fs13300-020-00869-z); Almustanyir, *Gastroparesis With the Initiation of Liraglutide: A Case Report*, Cureus (Nov. 28, 2020) (https://doi.org/10.7759/cureus.11735); Ishihara, *Suspected Gastroparesis With Concurrent Gastroesophageal Reflux Disease Induced by Low-Dose Liraglutide*, Cureus (Jul. 16, 2022) (https://doi.org/10.7759/cureus.26916); Preda, *Gastroparesis with bezoar formation in patients treated with glucagon-like peptide-1 receptor agonists: potential relevance for bariatric and other gastric surgery*, BJS Open (Feb. 2023) (https://doi.org/10.1093%2Fbjsopen%2Fzrac169).

their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

64.     On information and belief, Defendants not only knew or should have known that their GLP-1RAs cause delayed gastric emptying, resulting in risks of gastrointestinal injury and gastric outlet obstruction, but they may have sought out the delayed gastric emptying effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying,]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[48]

## D.    Defendants Failed to Warn of the Risks of Gastrointestinal Injury and Gastric Outlet Obstruction from Ozempic

65.     The Prescribing Information for Ozempic (the "label") discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of gastrointestinal injury and gastric outlet obstruction.[49]

66.     The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, but it does not include these adverse reactions in its "Warnings and Precautions" section, nor does it warn that these adverse reactions are symptoms of more severe conditions.

67.     Instead of properly disclosing gastrointestinal risks, the label discloses delayed gastric emptying in the "Drug Interaction" section and notes that Ozempic "may impact absorption

---

[48] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023), available at
https://dompubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (visited on 9/26/23).
[49] https://www.novo-pi.com/ozempic.pdf

of concomitantly administered oral medications." Similarly, in the "Mechanism of Action" section, the label minimizes gastrointestinal risks by stating that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase." These statements only describe the drug's mechanism of action and do not disclose gastrointestinal injury and gastric outlet obstruction as a ***risk*** of taking Ozempic, nor do they disclose gastrointestinal injury and gastric outlet obstruction as chronic conditions that can result as a consequence of taking Ozempic.

68.     Similarly, Novo Nordisk's main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Novo Nordisk does not disclose the risk of gastrointestinal injury and gastric outlet obstruction within the "Important Safety Information" section of their promotional website.[50]

69.     None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risks of gastrointestinal injury and gastric outlet obstruction.

70.     In fact, in January 2020, Novo Nordisk removed the "Instructions" portion from Section 17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels and there was no basis to remove them in 2020.

71.     The 2017 and 2019 labels for Ozempic also instructed physicians that "vomiting … decreases over time in the majority of patients." As a result, a physician would not only fail to

---

[50] *See* Ozempic.com (visited on 10/16/23).

appreciate vomiting as a symptom of gastrointestinal injury and gastric outlet obstruction but, even worse, would encourage a patient to continue using Ozempic despite the symptoms.

72.     In its section on "Females and Males of Reproductive Potential," the Ozempic label advises female users to discontinue Ozempic at least 2 months before a planned pregnancy due to the long washout period for semaglutide. This demonstrates that Novo Nordisk knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastrointestinal injury and gastric outlet obstruction.

73.     From the date Novo Nordisk received FDA approval to market Ozempic until the present time, Novo Nordisk made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Ozempic was causally associated with and/or could cause gastrointestinal injury including gastric outlet obstruction.

74.     Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastrointestinal injury and gastric outlet obstruction. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced in this Complaint.

75.     Upon information and belief, Defendants ignored the causal association between the use of GLP-1RAs and the risk of developing gastrointestinal injury and gastric outlet obstruction.

76.     Novo Nordisk's failure to disclose information that they possessed regarding the causal association between the use of GLP-1RAs and the risk of developing gastrointestinal injury and gastric outlet obstruction rendered the warnings for Ozempic inadequate.

77.     On information and belief, as a result of Novo Nordisk's inadequate warnings, the medical community at large and Plaintiff's prescribing physician in particular, were not aware that Ozempic can cause gastrointestinal injury including gastric outlet obstruction, nor were they aware that "common adverse reactions" listed on the label might be sequelae of gastrointestinal injury including gastric outlet obstruction.

78.     On information and belief, had Novo Nordisk adequately warned Plaintiff's prescribing physician that Ozempic is causally associated with gastrointestinal injury including gastric outlet obstruction, then the physician's prescribing decision would have changed by not prescribing Ozempic or by monitoring Plaintiff's health for symptoms associated with gastrointestinal injury including gastric outlet obstruction and discontinuing Ozempic when the symptoms first started.

79.     By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

**FIRST CAUSE OF ACTION**
**(FAILURE TO WARN – STRICT LIABILITY AND NEGLIGENCE)**

80.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

81.     The law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

82.     At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic that was used by Plaintiff.

83.     Ozempic was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

84.     At all relevant times, and at the times Ozempic left Defendants' control, Defendants knew or should have known that Ozempic was unreasonably dangerous because they did not adequately warn of the risk of gastrointestinal injury and gastric outlet obstruction, especially when used in the form and manner as provided by Defendants.

85.     Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff, without adequate warnings.

86.     Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market Ozempic to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

87.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

88.    At all relevant times, given its increased safety risks, Ozempic was not fit for the ordinary purpose for which it was intended.

89.    At all relevant times, given its increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

90.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as gastrointestinal injury and gastric outlet obstruction.

91.    At all relevant times, Plaintiff was using Ozempic for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

92.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including gastrointestinal injury and gastric outlet obstruction, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

93.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastrointestinal injury and gastric outlet obstruction, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate

warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote their product, Ozempic.

94.     The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastrointestinal injury and gastric outlet obstruction.

95.     The label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury and gastric outlet obstruction.

96.     The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

97.     The label for Ozempic was inadequate because it did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

98.     Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastrointestinal injury and gastric outlet obstruction.

99.     Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury and gastric outlet obstruction.

100.     Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

101.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

102.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of gastrointestinal injury including gastric outlet obstruction, which are causally associated with Ozempic, then the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

103.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury including gastric outlet obstruction, the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

104.    If Plaintiff had been warned of the increased risks of gastrointestinal injury including gastric outlet obstruction, which are causally associated with Ozempic, then Plaintiff would not have used Ozempic and/or suffered from gastrointestinal injury including gastric outlet obstruction and its sequelae.

105.    If Plaintiff had been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury including gastric outlet obstruction and its sequelae, then Plaintiff would not have used Ozempic and/or suffered gastrointestinal injury including gastric outlet obstruction and its sequelae.

106.    If Plaintiff had been warned of the increased risks of gastrointestinal injury including gastric outlet obstruction and its sequelae, which is causally associated with Ozempic, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Ozempic.

107.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic due to the risks of gastrointestinal injury including gastric outlet obstruction and its sequelae or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Ozempic.

108.    By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Ozempic.

109.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

110.    Defendants' inadequate warnings for Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

111.    Said inadequate warnings for Defendants' drug Ozempic were a substantial factor in causing Plaintiff's injuries.

112.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as

the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

113.    As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

## SECOND CAUSE OF ACTION
## (DESIGN DEFECT – STRICT LIABILITY AND NEGLIGENCE)

114.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

115.    Defendants are liable to Plaintiff for the injuries and damages sustained due to the inadequate and defective design of Ozempic.

116.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed Ozempic and owed a duty to consumers including Plaintiff and Plaintiff's prescribing physician(s) related to Ozempic.

117.    Defendants failed to carefully and properly design the Ozempic used by Plaintiff and placed the Ozempic into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design.

118.    Ozempic is defective in design and Defendants negligently and carelessly:

    a.    failed to use ordinary care in designing Ozempic;

    b.    failed to design Ozempic to minimize the adverse effects to the gastrointestinal and immune systems;

    c.    failed to counteract Ozempic's known adverse effects on the gastrointestinal and immune systems in the design of Ozempic; and

      d.      failed to take into consideration the proper dosage to avoid known adverse effects on the gastrointestinal and immune systems.

119. The design of Ozempic greatly outweighed the gastrointestinal and immune systems risks such that the foreseeable risks exceeded the benefits associated with the design of Ozempic.

120. At all relevant times, given the lack of efficacy and increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff or Plaintiff's prescribing physicians(s), and was more dangerous than expected.

121. Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Ozempic, Defendants designed and brought Ozempic to market when there were safer alternatives available.

122. Plaintiff is in the class of persons that Defendants should reasonably foresee as being subject to the harm caused by defectively designed Ozempic insofar as Plaintiff was the type of persons for whom Ozempic was intended to be used.

123. As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

**THIRD CAUSE OF ACTION**
**(FRAUDULENT CONCEALMENT)**

124. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

125. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic, which was used by Plaintiff as hereinabove described.

126.    At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

127.    At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of the increased risk of gastrointestinal injury and gastric outlet obstruction, especially when the drug was used in the form and manner as provided by Defendants.

128.    Defendants had a duty to disclose material information about Ozempic to Plaintiff and Plaintiff's prescribing physician(s), namely that Ozempic is causally associated with increased risk of gastrointestinal injury including gastric outlet obstruction and its sequelae, because Defendants have superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician would act on the basis of mistaken knowledge.

129.    Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

130.    Although the Ozempic labels lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, it does not mention gastrointestinal injury an gastric outlet obstruction as a risk of taking Ozempic, nor do they disclose gastrointestinal injury and gastric outlet obstruction as a chronic condition that can result as a consequence of taking Ozempic.

131.    Defendants' promotional website for Ozempic similarly does not disclose that Ozempic is causally associated with increased risk of gastrointestinal injury and gastric outlet obstruction.

132.    Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of Type 2 Diabetes.

133.    Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe, and Plaintiff would use Ozempic without the awareness of the risks of serious side effects, including gastrointestinal injury including gastric outlet obstruction and its sequelae.

134.    Defendants knew that Plaintiff and Plaintiff's prescribing physicians (s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic, as set forth herein.

135.    Upon information and belief, Plaintiffs prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Ozempic.

136.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastrointestinal injury including gastric outlet obstruction causally associated with Ozempic, they would not have prescribed Ozempic and/or would have provided Plaintiff with adequate information regarding the increased risk of gastrointestinal injury including gastric outlet obstruction causally associated with Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

137.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury including gastric outlet obstruction and its sequelae, they would not have

prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

138.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Ozempic.

139.    Had Plaintiff been informed of the increased risks causally associated with Ozempic, Plaintiff would not have used Ozempic and/or suffered gastrointestinal injury including gastric outlet obstruction and its sequelae.

140.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

141.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

142.    As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

<u>**FOURTH CAUSE OF ACTION**</u>
<u>**(MISREPRESENTATION)**</u>

143.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

144.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic, which was used by Plaintiff as hereinabove described.

145.    At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

146.    At all relevant times, Defendants knew or should have known of the serious side effects of Ozempic, including gastrointestinal injury and gastric outlet obstruction.

147.    At all relevant times, Defendants knew or should have known that Ozempic was not safe to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk in patients with type 2 diabetes, or promote weight loss, given its increased risk of gastrointestinal injury and gastric outlet obstruction.

148.    Nonetheless, Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Ozempic.

149.    Defendants represented affirmatively and by omission on television advertisements and on the label of Ozempic that Ozempic was a safe and effective drug for treatment of adults with Type 2 diabetes, despite being aware of increased risks of gastrointestinal injury and gastric outlet obstruction causally associated with using Ozempic.

150.    Defendants were aware or should have been aware that its representations were false or misleading and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the general public.

151.    Defendants' misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of Type 2 Diabetes.

152.    Upon information and belief that Plaintiff's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiff's prescribing physician(s) had no way to know were omitted.

153.    Upon information and belief that Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Ozempic to Plaintiff.

154.    Upon information and belief, had Plaintiff's prescribing physician(s) been informed of the increased risk of gastrointestinal injury including gastric outlet obstruction causally associated with Ozempic, Plaintiff's prescribing physician(s) would not have prescribed Ozempic and/or would have provided Plaintiff with adequate information regarding safety of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

155.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastrointestinal injury including gastric outlet obstruction and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the

lack of sufficient and/or adequate testing of Ozempic so that Plaintiff can make an informed decision regarding Plaintiff's use of Ozempic.

156.    Plaintiff had no way to determine the truth behind Defendant's false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts in which Plaintiff had no way to know were omitted.

157.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to accept, purchase and/or consume Ozempic.

158.    Had Plaintiff been told of the increased risk of gastrointestinal injury including gastric outlet obstruction and its sequelae causally associated with Ozempic, Plaintiff would not have used Ozempic and/or suffered gastrointestinal injury including gastric outlet obstruction and its sequelae.

159.    Had Plaintiff been told of the lack of sufficient and/or appropriate testing of Ozempic for safety risks, including gastrointestinal injury including gastric outlet obstruction and its sequelae, Plaintiff would not have used Ozempic and/or suffered gastrointestinal injury including gastric outlet obstruction and its sequelae.

160.    As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong

medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

161.    As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

## FIFTH CAUSE OF ACTION
## (UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION)

162.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

163.    At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed Ozempic into the stream of commerce and had a duty to consumers as well as the general public, including Plaintiff and Plaintiffs' prescribing physician(s), to be truthful, fair, and accurate, and to not mislead or deceive as it relates to Ozempic.

164.    Defendants engaged in unfair, deceptive, misleading, false, fraudulent, or unconscionable acts or practices in violation of Tenn. Code. Ann. § 47-18-101 *et seq.* and N.J. Stat. Ann. § 56:8-1 *et seq.* by:

   a.    representing that Ozempic had approval, characteristics, uses, or benefits that Ozempic did not have;

   b.    advertising Ozempic with the intent not to sell Ozempic as advertised; and

   c.    engaging in fraudulent or deceptive conduct that created a likelihood of confusion.

165.    Plaintiff relied on Defendants' misrepresentations and omissions about Ozempic in deciding to purchase and use Ozempic and Plaintiffs' prescribing physician(s) relied on

Defendants' misrepresentations and omissions about Ozempic in communicating with Plaintiff about Ozempic and deciding to prescribe Ozempic to Plaintiff.

166.    Plaintiff acted as a reasonable consumer in relying upon Defendants' misrepresentations and omissions concerning Ozempic in choosing to purchase and consume the Ozempic prescribed.

167.    As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

168.    As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

**SIXTH CAUSE OF ACTION**
**(BREACH OF WARRANTY – EXPRESS AND IMPLIED)**

169.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

170.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the entity/entities who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Ozempic which was used by Plaintiff.

171.    Ozempic was expected to and did enter the stream of commerce and reach the end user without a substantial change in the condition in which Ozempic was manufactured by Defendants.

172.    Defendants expressly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Ozempic was safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician(s) by way of the Ozempic label, websites, advertisements, promotional materials, and through other statements.

173.    At all relevant times and at the times Ozempic left Defendants' control, Ozempic did not conform to Defendants' express warranties because Ozempic not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus because of the increased risks of including gastrointestinal injury and gastric outlet obstruction.

174.    Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Ozempic was of merchantable quality and safe and fit for its ordinary purposes.

175.    At all relevant times and at the times Ozempic left Defendants' control, Ozempic did not conform to Defendants' implied warranties and was unfit for its ordinary purpose because Defendants failed to provide adequate warnings of the drugs' causal association with increased risk of including gastrointestinal injury and gastric outlet obstruction.

176.    Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

177.    Defendants knew or should have known that Ozempic was unreasonably dangerous because of its increased risk of including gastrointestinal injury and gastric outlet obstruction,

especially when the drug were used in the form and manner as provided by Defendants, but Defendants continued to place Ozempic into the market to be used by consumers, such as Plaintiff, without adequate warnings.

178.    Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe, and/or dispense Ozempic for use by their patients to improve glycemic control in people with type 2 diabetes, reduce cardiovascular risk, and/or to promote weight loss and that individuals, such as Plaintiff, would use and/or inject Ozempic for its ordinary purpose.

179.    The warranties made by Defendants regarding Ozempic were made with the intent to induce Plaintiff to use Ozempic and/or Plaintiff's prescribing physician(s) to prescribe Ozempic.

180.    Defendants knew and/or should have known that by making the warranties to Plaintiff and/or Plaintiff's prescribing physician(s), it would be the natural tendency of Plaintiff to rely on the warranties and use Ozempic and/or the natural tendency of Plaintiff's prescribing physician(s) to rely on the warranties and prescribe Ozempic.

181.    The unreasonably dangerous characteristics of Ozempic was beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

182.    The unreasonably dangerous characteristics of Ozempic was beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician(s) as to the drug's characteristics.

183.    Plaintiff and Plaintiff's prescribing physician(s) reasonably relied on Defendants as to the quality, merchantability, safety, and efficacy of Ozempic.

184.    As a result of Defendants' warranties, Plaintiff's prescribing physician(s) was induced to prescribe Ozempic to Plaintiff and Plaintiff was induced to use Ozempic.

185.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or inject Ozempic based upon their warranties.

186.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic based upon their warranties.

187.    If Defendants had not made the warranties, Plaintiff would not have used Ozempic and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic.

188.    Plaintiff's injuries and damages arose from a reasonably anticipated use of Ozempic by Plaintiff.

189.    Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned warranties.

190.    Accordingly, Defendants are liable as a result of their breach of warranties, express and implied, to Plaintiff.

191.    As a direct and proximate result of the above stated false representations and/or omissions by Defendants as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastrointestinal injury including gastric outlet obstruction and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

192.    As a result of the foregoing acts and omissions, Plaintiff sustained ascertainable loss and damages, serious injuries, economic and non-economic losses, and other damages.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

193.    At all times, Defendants were under a continuing duty to disclose the true character, quality, and nature of risks and dangers associated with Ozempic.

194.    Defendants are estopped from relying on any statute of limitations defense because Defendants purposefully and actively concealed information concerning known risks, side effects, and defects in Ozempic and have continued to represent Ozempic as safe for its intended use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

a.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

b.    Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

c.    Awarding Plaintiff the costs of these proceedings; and

d.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

**DATED:  DECEMBER 16, 2024**

Respectfully submitted,

<u>**s/Jessica W. Hayes (La. Bar No. 28927)**</u>
**Jessica W. Hayes (La. Bar No. 28927)**
MURRAY LAW FIRM
701 Poydras Street, Suite 4250
New Orleans, Louisiana 70139
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
E-mail: jhayes@murray-lawfirm.com

**ATTORNEY FOR PLAINTIFF**